**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Civil Action No.: 24-cv-2862 |
| v. | |
| MARYLAND DEPARTMENT OF STATE POLICE, | |
| Defendant. | |

**MEMORANDUM IN SUPPORT OF
JOINT MOTION FOR PROVISIONAL APPROVAL AND ENTRY OF
CONSENT DECREE**

## TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................... 1

II.     PROCEDURAL BACKGROUND............................................................................ 1

III.    FACTUAL BACKGROUND .................................................................................... 2

IV.     OVERVIEW OF THE CONSENT DECREE ........................................................... 4

        A.      Injunctive Relief............................................................................................... 4

        B.      Individual Relief ............................................................................................... 5

                    1.      Monetary Relief .................................................................................... 5

                    2.      Priority Hiring Relief ........................................................................... 6

        C.      Procedures for Entry and Implementation of the Decree................................... 7

                    1.      Notice of Settlement and Process to Object to Entry of the Decree .......... 7

                    2.      Fairness Hearing on the Terms of the Consent Decree............................ 7

                    3.      Notice of Final Entry of the Decree and Process to Claim and/or
                            Object to Individual Relief.................................................................... 8

                    4.      Fairness Hearing on Individual Relief .................................................... 8

                    5.      Implementation of Individual Relief....................................................... 9

        D.      Continuing Jurisdiction .................................................................................... 9

V.      ARGUMENT........................................................................................................ 10

        A.      Legal Standard ............................................................................................... 10

        B.      The Consent Decree is Fair, Adequate, and Reasonable. ..................................... 12

                    1.      The United States Contends it is Likely to Succeed on the Merits,
                            but Both Parties Recognize the Risk Associated with Trial. ................... 12

                                a.      There is Ample Evidence that the Challenged Tests Result in a
                                        Disparate Impact on Female and African-American Applicants. ..... 13

                                b.      There is Insufficient Evidence that the Challenged Tests are Job
                                        Related and Consistent with Business Necessity.............................. 14

                                c.      Litigation and Trial Would Nevertheless Be Complex and Lengthy
                                        and Impose Substantial Risks and Costs on Both Parties. ................. 16

                    2.      The Consent Decree Provides Relief that is Adequate and Appropriate
                            Under Title VII. .................................................................................. 17

                                a.      The Individual Relief in the Decree is Adequate and Appropriate… 17

                                b.      The Injunctive Relief in the Decree is Adequate and Appropriate.... 19

                    3.      The Stage of Proceedings, the Absence of Collusion, and the Experience
                            of Counsel Support Approval of the Decree............................................ 20

                    4.      The Decree Provides for Two Hearings to Ensure Fairness. ................... 21

VI.     CONCLUSION..................................................................................................... 23

## I.    INTRODUCTION

Plaintiff United States of America ("United States") and Defendant Maryland Department of State Police ("MDSP") (collectively, the "Parties") submit this Memorandum in Support of the Parties' Joint Motion for Provisional Approval and Entry of the Consent Decree ("Joint Motion").  The Parties request that the Court provisionally approve and enter the Consent Decree ("Decree") filed with this Joint Motion as Exhibit A, schedule a Fairness Hearing on the Terms of the Consent Decree, and stay all deadlines pending the Court's determination of whether to enter the Decree as a final order.

As set forth below, the Court should provisionally approve and enter the Decree because its terms are fair, adequate, and reasonable, and are not illegal, a product of collusion, or against the public interest.  If entered, the Decree will resolve all of the United States' claims in this action, establish procedures for MDSP's adoption of selection devices for hiring entry-level Troopers that comply with Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and provide appropriate individual relief in the form of monetary awards and priority hiring awards to qualified female and African-American applicants who were affected by the employment practices the United States challenged in this case.

## II.    PROCEDURAL BACKGROUND

On July 15, 2022, the United States notified MDSP that it was opening an investigation to determine, *inter alia*, whether MDSP violated Title VII by engaging in a pattern or practice of discrimination against African-American applicants for its entry-level Trooper position.  On March 1, 2023, the United States notified MDSP that it was expanding the scope of its investigation to include investigation of whether MDSP also violated Title VII by engaging in a pattern or practice of discrimination against female applicants for its entry-level Trooper

position.  Throughout its investigation, the United States reviewed and analyzed extensive documents and data related to MDSP's hiring practices.  On March 11, 2024, the United States notified MDSP that it concluded MDSP was engaged in a pattern or practice of disparate impact discrimination against both African-American and female applicants for its entry-level Trooper position in violation of Title VII.

The United States commenced this action on October 2, 2024, alleging that MDSP's use of a certain written test, the Police Officer Selection Test ("POST"), has an unlawful disparate impact on African-American applicants for the entry-level Trooper position, *see* Compl. ¶ 2, Dkt. No. 1, and that its use of a certain physical fitness test, the Functional Fitness Assessment Test ("FFAT"), has an unlawful disparate impact on female applicants for the same, *id*.  The United States does not allege that MDSP engaged in intentional discrimination against African-American or female candidates.  MDSP does not admit to liability under Title VII.

Following the United States' notification to MDSP on March 11, 2024, MDSP expressed a commitment to working to resolve the United States' allegations.  The Parties engaged in productive settlement discussions during the spring and summer of 2024.  These efforts led to the successful drafting of a proposed Consent Decree, filed with this Joint Motion, and an agreement to waive hearings and findings of fact and conclusions of law on all remaining issues in the case, subject to the fairness hearings outlined below.

## III.    FACTUAL BACKGROUND

The United States contends, and MDSP does not dispute for purposes of this Consent Decree, the following:  Since at least 2017, the multi-step selection process for hiring entry-level Troopers at the MDSP has included both the FFAT and the POST.  The FFAT is comprised of five events conducted in the following order: (i) push-ups; (ii) sit-ups; (iii) flexibility reach; (iv)

trigger pull; and (v) 1.5-mile run.  To pass the FFAT, applicants must meet the following passing standards for each event: (i) complete 18 push-ups in one minute; (ii) complete 27 sit-ups in one minute; (iii) reach approximately 1.5 inches beyond the applicant's toes while seated; (iv) pull a trigger 10 times with each hand; and (v) run 1.5 miles within 15 minutes and 20 seconds (the "Challenged Physical Fitness Test").  Only those applicants who achieve the passing standard for each event of the FFAT are eligible to continue in MDSP's selection process for the Trooper position.  Trooper applicants may take the FFAT up to three times in a given year.

Since at least 2017, female applicants for the Trooper position have passed the FFAT at a lower rate than male applicants.  The pass rate for female applicants is less than 80% of the pass rate for male applicants.  The difference between the pass rates of female and male applicants is statistically significant at approximately 11.2 units of standard deviation.

The POST includes four separate components, which purport to test: mathematics (20 questions); reading comprehension (25 questions); grammar (20 questions); and report writing skills (10 questions).  To pass the POST, applicants must achieve an aggregate score of 70% on all components combined and must score at least 70% on the reading comprehension component, 70% on the grammar component, and 70% on the report writing skills component (the "Challenged Written Test," and together with the FFAT, the "Challenged Tests").  There is no minimum passing score on the mathematics component, but the score on the mathematics component is factored into the aggregate score.  Only those applicants who pass the POST are eligible to continue in MDSP's selection process for the Trooper position.

Since at least 2017, African-American applicants for the Trooper position have passed the POST at a lower rate than white applicants.  The pass rate for African-American applicants is less than 80% of the pass rate for white applicants.  The difference between the pass rates of

African-American and white applicants is statistically significant at approximately 11.4 units of standard deviation.

The United States estimates that since 2017, at least 29 additional female applicants would have been hired by the MDSP as Troopers absent the disparate impact of the FFAT, and at least 19 additional African-American applicants would have been hired by the MDSP as Troopers absent the disparate impact of the POST.

MDSP's use of the FFAT and the POST is ongoing.  The Challenged Tests have been administered throughout the Parties' settlement discussions, and the Parties stipulate that but for the United States' lawsuit, MDSP would have continued using the FFAT and the POST for some time.

## IV.    OVERVIEW OF THE CONSENT DECREE

### A.    Injunctive Relief

Under the Decree, MDSP, in consultation with the United States will adopt and use lawful new selection devices to replace the Challenged Tests.  Ex. A (Decree). ¶ 47.  The new selection devices will be developed, validated, and used in accordance with federal law and generally accepted methods and standards in industrial and organizational psychology.  *Id.*  The new selection devices will not have a statistically significant disparate impact on the basis of race or sex or will be job-related for the Trooper position and consistent with business necessity, in accordance with Title VII.  *Id.*

The Parties have agreed and are committed to follow the timelines for implementing the new selection devices established in the Decree.  The Parties further recognize that the development of new selection devices will take time to complete.  If MDSP's immediate operational needs require the hiring of entry-level Troopers before its new selection devices are

developed and approved, the Parties have agreed that MDSP may use the Challenged Tests on an interim basis for the purpose of hiring no more than two (2) classes of entry-level Troopers to begin the MDSP Academy after the Date of Entry of the Decree. *Id*. ¶¶ 45-46. Other than this specific and limited interim use of the Challenged Tests, the Parties have agreed that MDSP will be enjoined from using any selection device for hiring Troopers that results in adverse impact on female or African-American applicants and is not shown to be job-related and consistent with business necessity. *Id.* ¶¶ 35-36.

      **B.**    **Individual Relief**

      Under the terms of the Decree, MDSP will offer eligible claimants[1] (1) monetary relief (*i.e.*, back pay) and/or (2) priority hiring relief with retroactive seniority and hiring bonuses in lieu of pension credits. *Id*. ¶ 55. Both forms of individual relief are remedial and will be awarded only to individuals who were excluded from the Trooper selection process by the Challenged Tests but would otherwise have been eligible for hire as Troopers.

      **1.**    **Monetary Relief**

      The Decree provides that MDSP will create a Settlement Fund of two million, seven hundred and fifty thousand dollars ($2,750,000.00) to be distributed to eligible female and African-American claimants. *Id*. ¶ 57. To be eligible for a monetary award, a claimant must have met the minimum qualifications for employment that were in place when they were disqualified by a Challenged Test and be either: (1) Black or African-American, and disqualified by the Challenged Written Test since 2017, or (2) a woman or female, and disqualified by the Challenged Physical Fitness Test since 2017. *Id*. ¶ 65. Each eligible claimant will receive a *pro*

---

[1] As defined in the Decree and used herein, a "claimant" is a person who submits an Interest-in-Relief Form during the claims process described in the Decree.

*rata* share of the Settlement Fund, as determined by the United States and subject to the final approval of the Court, *id.* ¶¶ 73, 86, representing the value of some of the wages the claimant would have received had he or she not been disqualified by a Challenged Test and had instead been hired into the Trooper position for which he or she applied, *id.* ¶ 8.

### 2. Priority Hiring Relief

The Decree also provides that MDSP shall award priority hiring relief with retroactive seniority and hiring bonuses in lieu of pension credits to up to twenty-five (25) claimants. *Id.* ¶ 109. To be eligible for priority hiring relief, a claimant must meet the same conditions described above, and in addition, must meet the minimum qualifications for employment that are in place at the time the claimant is seeking priority hiring relief. *Id.* ¶¶ 65-66. Importantly, the Decree does not require MDSP to hire any individual who is not currently qualified to be a Trooper. Claimants who are eligible for priority hiring relief will be given an opportunity to complete MDSP's new lawful selection process for all other entry-level Trooper applicants, and only those who successfully pass all steps in that process will ultimately be hired.[2] *Id.* ¶ 118. Claimants who are selected as priority hires will receive retroactive seniority, meaning that for certain purposes—namely, determining their rate of pay, rate of accrual for vacation leave, and their order in layoffs, reductions in force, and recalls therefrom—priority hires will be treated as though they had been hired in the academy class they would have been eligible for had they not

---

[2] In addition to eligible claimants who successfully pass all steps in MDSP's new lawful selection process, a limited number of eligible incumbent Troopers may be credited as priority hires. Ex. A (Decree) ¶¶ 123-25. These are current Troopers who were disqualified by a Challenged Test but reapplied to the Trooper position and were later hired. The Decree provides that up to five (5) such individuals may count as priority hires if MDSP credits them with retroactive seniority and a proportional hiring bonus in lieu of pension credits; and beyond those five (5), additional incumbents may be credited as priority hires if the list of eligible non-incumbent claimants is first exhausted. *Id.*

been disqualified by a Challenged Test. *Id.* ¶¶ 132-34. Priority hires' initial assignment of duty station will also be selected by the MDSP from among the claimant's top three preferences. *Id.* ¶ 132. And priority hires, including any incumbents who count as a priority hire, will receive a hiring bonus in lieu of pension credits in amounts specified in the Decree. *Id.* ¶¶ 135-37.

### C.    Procedures for Entry and Implementation of the Decree

The Parties respectfully request that the Court provisionally enter the Decree and schedule an initial Fairness Hearing on the Terms of the Decree no less than 120 days from the date of the Court's order on this Joint Motion. The Decree, if provisionally approved, sets forth the following schedule and procedures for implementation of the Decree.

### 1.    Notice of Settlement and Process to Object to Entry of the Decree

After the Decree is provisionally entered, notice will be sent to all applicants who identified as female and failed the Challenged Physical Fitness Test, and all applicants who identified as African American and failed the Challenged Written Test, during the relevant time period. *Id.* ¶ 22; *id.* at Appx. A. Notice will also be provided to currently employed Troopers, *id.* ¶ 24, and to the general public on MDSP's website, via all social media accounts regularly used by MDSP, and in the Baltimore Sun, the Capital Gazette, the Baltimore Banner, and on WTOP's local Maryland website. *Id.* ¶ 25. The notice of the Decree's provisional entry will explain how to submit an objection to the terms of the Decree. *See id.* at Appxs. A, B.

### 2.    Fairness Hearing on the Terms of the Consent Decree

The Parties respectfully request that the Court hold a Fairness Hearing on the Terms of the Consent Decree no less than 120 days after the Decree is provisionally entered. *Id.* ¶ 12. At this fairness hearing, the Court will consider any objections that have been received and determine whether the terms of the Decree are fair, lawful, and reasonable. *Id.* If the Court

concludes the Decree is fair, lawful, and reasonable, the Court will enter the Decree as final at or after the fairness hearing. *Id*. ¶ 34.

### 3. Notice of Final Entry of the Decree and Process to Claim and/or Object to Individual Relief

After the Decree is entered as final, a second notice will be sent to all applicants who identified as female and who failed the FFAT, and all applicants who identified as African American and failed the POST, during the relevant time period. *Id*. ¶ 62. The Notice of Entry of the Consent Decree will explain that interested applicants may seek individual relief in the form of back pay and/or priority hiring with retroactive seniority and hiring bonus in lieu of pension credits by submitting an Interest-In-Relief Form. *Id*. ¶¶ 62-64; Appxs. C, D.

The United States will review the Interest-In-Relief Forms and determine whether claimants are eligible for the individual relief sought. *Id*. ¶¶ 72, 78. Each claimant will be notified of the United States' preliminary determination concerning his or her eligibility for the individual relief sought and provided with instructions on how to submit an objection to that determination. *Id*. ¶ 79; Appxs. E, F. MDSP will also have the opportunity to object to any of the United States' eligibility determinations. *Id*. ¶ 76. The United States will file a Proposed Individual Relief Awards List with the Court containing its preliminary eligibility determinations for individual relief, as well as any objections that have been received regarding these determinations. *Id*. ¶¶ 77, 84.

### 4. Fairness Hearing on Individual Relief

The Parties respectfully request that the Court will hold a second fairness hearing, the Fairness Hearing on Individual Relief, no less than 120 days after receiving the Proposed Individual Relief Awards Lists. *Id*. ¶ 78. At this second fairness hearing, the Court will determine whether any objections to the United States' preliminary eligibility determinations for

individual relief are well-founded.  *Id.* ¶¶ 86-87.  If the Court determines that the individual relief awards are fair, adequate, and reasonable, the Court will approve the Final Individual Relief Awards List at or after the Fairness Hearing on Individual Relief.  *Id.* ¶ 88.

> ### 5. Implementation of Individual Relief

Following the Court's approval of the individual relief awards, each claimant eligible for an award will be notified and provided with instructions on how to sign a release of claims and accept their award.  *Id.* ¶ 89, Appxs. G, H.  Once claimants have accepted their awards, invitations to participate in the priority hiring selection process will promptly be distributed to eligible claimants, *id.* ¶ 119, and monetary awards will be mailed to eligible claimants by no later than one hundred and fifty (150) days after the Court approves the Final Individual Relief Awards List, *id.* ¶ 102.

> ### D. Continuing Jurisdiction

For the duration of the Decree, the Court will retain jurisdiction over this matter for the purpose of resolving any disputes or entering any orders that may be appropriate to implement the Decree.  Provided there are no outstanding disputes before the Court, this Decree shall be dissolved three years after the Date of Entry of the Decree or, if later, upon completion of the following: (i) fulfillment of the Parties' obligations regarding injunctive relief under the Decree, and in particular, the development of the New Selection Devices; (ii) completion of the issuance of individual monetary relief to be awarded under the Decree; and (iii) the passage of thirty (30) days after MDSP provides the last of the reports regarding Priority Hiring Relief as required by the Decree.  *Id.* ¶ 146.

## V.    ARGUMENT

### A.    Legal Standard

"In enacting Title VII, Congress expressed a strong preference for encouraging voluntary settlement of employment discrimination claims." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981); *see also United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999) ("In considering whether to enter a proposed consent decree, a district court should be guided by the general principle that settlements are encouraged."); *EEOC v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985) (noting Congress' "express preference for settlement" in Title VII cases).  Accordingly, it has long been recognized that cooperation and voluntary compliance are the preferred means of achieving Title VII's goals of ensuring equal employment opportunities and eliminating unlawful employment practices. *See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland*, 478 U.S. 501, 515-16 (1986) (citing *Alexander v. Gardener-Denver Co.*, 415 U.S. 36, 44 (1974)).

To resolve a pattern or practice suit brought under Title VII, the proposed agreement must be "fair, adequate, and reasonable and must not be illegal, a product of collusion, or against the public interest." *See L.J. v. Wilbon*, 633 F.3d 297, 311 (4th Cir. 2011) (internal quotation marks omitted) (quoting *North Carolina*, 180 F.3d at 581).

In determining the fairness, adequacy, and reasonableness of a proposed agreement, courts should "weigh[] the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." *Carson*, 450 U.S. at 88 n.14; *see also North Carolina*, 180 F.3d at 581; *United States v. Baltimore County, Md.*, No. CCB-19-2465, 2021 WL 2000480, at *4 (D. Md. May 19, 2021) .  When making this assessment, a court is not required to conduct "a trial or a rehearsal of the trial," but it must still "ensure" that it reaches "an informed,

just and reasoned decision.'" *North Carolina*, 180 F.3d at 581 (internal quotation marks

omitted) (quoting *Flinn v. FMC Corp.*, 528 F.2d 1169, 1172-73 (4th Cir. 1975)).[3]

      In evaluating a proposed agreement, courts also consider "the extent of discovery that has

taken place, the stage of the proceedings, the want of collusion in the settlement and the

experience of plaintiffs' counsel who negotiated the settlement." *Id.* (quoting *Carson v. Am.*

*Brands, Inc.*, 606 F.2d 420, 430 (4th Cir. 1979) (en banc) (Winter, J. dissenting), *adopted by*

*Carson v. Am. Brands, Inc.*, 654 F.2d 300, 301 (4th Cir. 1981) (en banc) (per curiam)); *accord*

*Baltimore Cty.*, 2021 WL 2000480, at *4. A court should afford "great weight" to the opinion of

competent counsel, absent any showing of collusion or bad faith. *Carson*, 606 F.2d at 430 (4th

Cir. 1979). Moreover, "where a government agency charged with protecting the public interest

has pulled the laboring oar in constructing the proposed settlement, a reviewing court may

appropriately accord substantial weight to the agency's expertise and public interest

responsibility." *Am. Canoe Ass'n v. U.S. Env't Prot. Agency*, 54 F. Supp. 2d 621, 625 (E.D. Va.

1999) (internal quotation marks omitted) (quoting *Bragg v. Robertson*, 54 F. Supp. 2d 653, 660

(S.D. W. Va. 1999)); *see also Maryland v. GenOn Ash Mgmt., LLC*, 2013 WL 2637475, at *1

(D. Md. June 11, 2013) ("[W]hen a settlement has been negotiated by a specially equipped

agency, the presumption in favor of settlement is particularly strong.") (citation omitted).

---

[3] The Fourth Circuit has not addressed whether the "strong basis in evidence" standard
established in *Ricci v. DeStefano* applies to Title VII consent decrees or settlement agreements.
557 U.S. 557, 584 (2009). The Parties maintain that it does not. The *Ricci* standard applies only
where an employer seeks to upset legitimate expectations for use of an already established
selection process by invalidating past test results to avoid possible disparate impact liability. The
*Ricci* Court noted that it did not question the permissibility of "an employer's affirmative efforts
to ensure that all groups have a fair opportunity to… participate in the process by which
[selections] will be made." *Id.* at 585. Where, as here, a Decree contains requirements to ensure
that an employer's *future* hiring cycles provide such opportunity and comply with Title VII, the
standards described above apply.

**B.      The Consent Decree is Fair, Adequate, and Reasonable.**

The Court should provisionally approve and enter the Decree because its terms are fair, adequate, and reasonable, and are not illegal, a product of collusion, or against the public interest. *See Wilbon*, 633 F.3d at 311 (quoting *North Carolina*, 180 F.3d at 581).  The Parties, represented by competent and experienced counsel, in possession of ample information about the United States' claims, have weighed the United States' likelihood of success on the merits and agree that the relief provided for in the Settlement Agreement is appropriate and offers the best path forward for resolution of this case. *See Carson,* 450 U.S. at 88 n.14; *see also North Carolina*, 180 F.3d at 581.

**1.      The United States Contends it is Likely to Succeed on the Merits, but Both Parties Recognize the Risk Associated with Trial.**

The United States brought this lawsuit in accordance with Section 707 of Title VII, 42 U.S.C. § 2000e-6, which authorizes the Attorney General to bring an action against a state or local government employer engaging in a pattern or practice of discrimination in violation of Title VII.[4]  Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). This disparate impact theory was codified by Congress in the Civil Rights Act of 1991 and ensures the removal of "employment procedures or testing mechanisms that operate as 'built-in headwinds' for [protected] groups and are unrelated to measuring job capability." *See Griggs*, 401 U.S. at 432.  For example, testing devices used to screen potential employees are unlawful

---

[4] The same statutory provision expressly grants district courts jurisdiction over such suits.  42 U.S.C. §2000e-6(b) ("The district courts of the United States shall have and shall exercise jurisdiction of proceedings instituted pursuant to this section . . . .").

under Title VII if they disproportionately exclude African-American candidates compared with their white counterparts, or female candidates compared with their male counterparts, and the test is not shown to measure the candidates' job capabilities.  *See id.*; *Robinson v. Lorillard Corp.*, 444 F.2d 791, 798 n.6 (4th Cir. 1971) (quoting *Griggs*, 401 U.S. at 436) (requiring a "demonstrable relationship to successful performance of the jobs for which [the test] was used"); 42 U.S.C. § 2000e-2(k).

> **a.    There is Ample Evidence that the Challenged Tests Result in a Disparate Impact on Female and African-American Applicants.**

In the Fourth Circuit, to establish a *prima facie* case of disparate impact, a plaintiff must demonstrate that a specific employment practice causes "racially disparate results."  *Brown v. Nucor Corp.*, 785 F.3d 895, 915 (4th Cir. 2015) ("*Brown II*").  To make this showing, the United States must identify the specific employment practice it challenges and demonstrate causation by offering "statistical evidence of a kind and degree sufficient to show that the practice in question caused the exclusion of applicants for jobs or promotions because of their membership in a protected group."  *Walls v. City of Petersburg*, 895 F.2d 188, 191 (4th Cir. 1991) (citations omitted); *see also Axel v. Apfel*, 171 F. Supp. 2d 522, 526 (D. Md. 2000); *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 987 (1988); *EEOC v. Am. Nat'l Bank*, 652 F.2d 1176, 1190-93 (4th Cir. 1981) (discussing meaning and use of standard deviation analyses), *cert. denied*, 549 U.S. 923 (1982).  Disparities in outcomes that are equivalent to two to three units of standard deviation are sufficient to establish a *prima facie* case.  *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 n.14 (1977) (citing *Castaneda v. Partida*, 430 U.S. 482, 497 n.17 (1977)); *see also Brown II*, 785 F.3d at 915.  At this level of statistical significance, the probability that the

disparity in outcomes is a result of chance is less than five percent. *See Am. Nat'l Bank*, 652 F.2d at 1190-93. This disparity raises "an inference of causation." *Watson*, 487 U.S. at 995.

If this case proceeded to trial, the United States would have to establish a *prima facie* case of discrimination by showing that the Challenged Written Test had a statistically significant disparate impact on African-American applicants and the Challenged Physical Fitness Test had a statistically significant disparate impact on female applicants. *See* 42 U.S.C. § 2000e-2(k)(1)(A)(i). Based on comprehensive data regarding MDSP's administration of the Challenged Tests since 2017, the United States contends it can demonstrate – and the Parties have stipulated for purposes of settlement – that the disparity between the pass rates for African-American applicants compared to white applicants on the Challenged Written Test is statistically significant at approximately 11.4 units of standard deviation. Ex. A ¶ viii. Likewise, the Parties stipulate that the disparity between the pass rates of female and male applicants on the Challenged Physical Fitness Test is statistically significant at approximately 11.2 units of standard deviation. *Id*. ¶ xiv. These disparities are well above the two to three standard deviation threshold required by courts in the Fourth Circuit, *see Am. Nat'l*, 652 F.2d at 1192, providing ample evidence of causation. Thus, if this case proceeded to trial, the evidence would support a *prima facie* case of disparate impact with respect to both of the Challenged Tests under Title VII. *See id*.

### b.    There is Insufficient Evidence that the Challenged Tests are Job Related and Consistent with Business Necessity.

Once the United States has established a *prima facie* case of disparate impact, MDSP must prove that its use of the Challenged Tests is "job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). In other words, if the written and physical examinations, "cannot be shown to be related to job performance, the

14

practice is prohibited." *Griggs*, 401 U.S. at 431-32. As explained by the Supreme Court, "discriminatory tests are impermissible unless shown, by professionally acceptable methods, to be predictive of or significantly correlated with important elements of work behavior which comprise or are relevant to the job." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 431 (1975) (citation and internal quotation marks omitted). To make this showing, the employer must demonstrate that the employment tests have been validated through a professionally acceptable methodology, that is, a validity study. *See* 29 C.F.R. § 1607; *Robinson*, 444 F.2d at 798 n.7. To prove or disprove a selection device's so-called "validity," parties typically rely on experts in the field of industrial/organizational psychology. *See Bazile v. City of Houston*, 858 F. Supp. 718, 721 (S.D. Tex. 2012) (noting that "courts must take into account the expertise of test validation professionals").

Here, the United States contends that MDSP cannot demonstrate that its use of the Challenged Tests was job related for the position and consistent with business necessity as required by Title VII. Compl. ¶¶ 20, 29. In making this contention, the United States relies on experts in the fields of industrial/organizational psychology and exercise physiology, who assessed the validity evidence in support of the FFAT and the POST that MDSP produced in the course of the United States' investigation and would testify, if the case were litigated to conclusion, that such evidence is insufficient to support MDSP's use of the Challenged Tests. While MDSP does not admit liability under Title VII, for purposes of settlement only, MDSP stipulates that it cannot currently demonstrate that its uses of the Challenged Tests, including the passing standards set and the scoring methodologies applied, are job related and consistent with business necessity for the Trooper position. 29 C.F.R. § 1607.15(A)(3). As a result, MDSP

cannot demonstrate that the Challenged Tests meet the requirements of Section 703(k) of Title VII, 42 U.S.C. § 2000e-2(k).

> **c.      Litigation and Trial Would Nevertheless Be Complex and Lengthy and Impose Substantial Risks and Costs on Both Parties.**

Even if the United States' case is likely to succeed on the merits, protracted litigation and trial would impose substantial risks and costs on both Parties. "When the prospect of ongoing litigation threatens to impose high costs of time and money on the parties, the reasonableness of approving a mutually-agreeable settlement is strengthened." *Klein v. O-Neal, Inc.*, 705 F. Supp. 2d 632, 651 (N.D. Tex. 2010). As a general matter, Title VII disparate impact cases are complex and time-consuming. Cases challenging just one selection device routinely span years, and proceedings are often bifurcated for separate trials on liability and damages. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 361 (1977).

Here, where not one but two selective devices are being challenged, litigation would necessarily involve extensive discovery, in-depth statistical analyses of the adverse impact of the Challenged Tests conducted by experts, in-depth analyses of the development and predictive capacities of the Challenged Tests conducted by experts, and in-depth data-based estimates of monetary damages, all reported in lengthy expert reports and examined in lengthy depositions. Such inquiries routinely lead to extensive motions practice. Not only would such litigation be costly for both Parties, but each Party also recognizes the risk inherent in trial of such claims. The Parties' negotiated Consent Decree avoids these costs and risks, ensures timely relief to affected individuals, and allows MDSP's hiring to proceed on surer footing than it otherwise could. Thus, the likelihood of the United States' success on the merits and the complexity, expense, and likely duration of litigation all support provisional entry of the Decree.

### 2.    The Consent Decree Provides Relief that is Adequate and Appropriate Under Title VII.

The amount and form of relief offered in the Consent Decree are adequate and appropriate considering the factors discussed above.  The relief is within the range of potential recovery had this matter been litigated to conclusion and represents a reasonable compromise of the United States' claims.

### a.    The Individual Relief in the Decree is Adequate and Appropriate.

One of the central purposes of Title VII is to make whole persons who have been harmed by employment practices that violate the statute.  *See Albemarle*, 422 U.S. at 418.  In enacting Title VII, "Congress took care to arm the courts with full equitable powers" so that the courts may fashion relief for identifiable victims of unlawful employment practices.  *Id*.  In exercising these equitable powers, a court may fashion relief "as may be appropriate, which may include, but is not limited to . . . hiring of employees," with monetary and other equitable relief as the court deems appropriate.  *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763 (1976) (quoting Section 706(g) of Title VII, 42 U.S.C. § 2000e-5(g)).  In Title VII pattern or practice cases, the goal is to place affected individuals at, or as near as possible to, the situation they would have been in if not for the challenged practices.  *Albemarle*, 422 U.S. at 418-19 (citation omitted).  Guided by these principles, courts have routinely approved settlements that include "the three basic components of 'make whole' relief in hiring discrimination cases: a job offer, backpay, and retroactive seniority."  *See Wrenn v. Sec'y, Dep't of Veterans Affairs*, 918 F.2d 1073, 1076 (2d Cir. 1990); *United States v. Massachusetts*, 869 F. Supp. 2d 189, 191-92, 196 (D. Mass. 2012).

Here, the individual relief the Decree provides is consistent with the make-whole relief authorized by Title VII.  The amount of back pay and the number of priority hires provided by

17

the Decree are both premised on a statistical calculation of the "hiring shortfall," or the number

of additional African-American and female applicants who would have been hired absent the

discriminatory effect of the Challenged Tests.  Based on extensive data regarding MDSP's hiring

and use of the Challenged Tests since 2017, the United States estimates that MDSP would have

hired approximately nineteen (19) more African-Americans Troopers but for the discriminatory

effect of the Challenged Written Test and twenty-nine (29) more female Troopers but for the

discriminatory effect of the Challenged Physical Fitness Test.

The Settlement Fund of two million, seven hundred and fifty thousand dollars

($2,750,000.00), Ex. A ¶ 61, and the twenty-five (25) priority hires, including retroactive

seniority and hiring bonuses in lieu of pension credits, *id*. ¶¶ 113, 117, that are provided for in

the Decree fall within the range of what the Parties expect the United States could recover at

trial.  The monetary relief of two million, seven hundred and fifty thousand dollars

($2,750,000.00) is substantial and will provide claimants with some measure of financial

restitution, even though it is less than what could be recovered if the United States were prevail

at trial.[5]  Moreover, the method for apportioning the monetary relief in the Decree will ensure

that no Claimant receives back pay in excess of the claimant's make whole relief.  *Id.* ¶¶ xviii,

73.  The number of priority hires is not higher than the United States' estimated hiring shortfall

caused by the Challenged Tests.  And the retroactive seniority and hiring bonuses that will be

provided to priority hires represent an attempt, to the extent possible, to put claimants who would

---

[5] The United States sought back pay damages dating back two years from the date MDSP was notified of the United States' investigation of each selection device—so for the POST, the claimed damages began accruing in July 2020, and for the FFAT, in March 2021.  The Parties agreed to the amount of the Settlement Fund after consideration and discussion of several factors, including the estimated "hiring shortfall" discussed above, the value of the wages and benefits Troopers earned during the relevant time frame, estimates of expected mitigation, litigation risk, and the benefit of settlement to claimants.

have been hired sooner but for MDSP's use of the Challenged Tests in the position they would have been in but for the practices challenged in this case—such relief is necessary to achieve the make whole purpose of Title VII. *Franks*, 424 U.S. at 764-65. Finally, both the monetary and priority hiring relief are limited to individuals who were affected by MDSP's hiring practices—those applicants who were disqualified from the selection process by the Challenged Tests in the relevant timeframe.

> **b.** **The Injunctive Relief in the Decree is Adequate and Appropriate.**

When an employer has engaged in a pattern or practice of discrimination in violation of Title VII, an award of injunctive relief is justified without any further showing. *See Int'l Bhd. of Teamsters*, 431 U.S. at 361. Appropriate injunctive relief may include an order prohibiting an existing discriminatory practice; an order for the adoption of new, lawful selection procedures; or "any other order necessary to ensure the full enjoyment of the rights protected by Title VII." *Id.* (internal quotations omitted). Consistent with these parameters, the injunctive relief in the Decree provides for the cessation of the current practices alleged by the United States to constitute a pattern or practice of discrimination, which the Parties stipulate would not have been abandoned but for the instant suit. Specifically, the Decree enjoins the MDSP from its continued use of the Challenged Tests[6] and requires it to develop and administer New Selection Devices that comply with Title VII to replace the Challenged Tests. *See* Ex. A ¶¶ 37-38, 47.

---

[6] Except, as described above, that MDSP may continue using the Challenged Tests on an interim basis to hire no more than two (2) academy classes of Troopers. Ex. A ¶ 45-46.

### 3.    The Stage of Proceedings, the Absence of Collusion, and the Experience of Counsel Support Approval of the Decree.

Despite the early stage of the proceedings here, the Parties have had ample opportunity to evaluate their case and ample factual basis on which to rely in reaching their joint conclusion that the relief provided in the Decree is a reasonable compromise, given the likelihood of the United States' success on the merits and the risks and costs that would be involved in litigating it to trial. Though the Parties reached agreement pre-discovery, it was only after an extensive twenty (20) month pre-suit investigation by the United States and more than five (5) months of settlement negotiations.  During the pre-suit investigation, the United States conducted multiple on-site interviews with MDSP officials responsible for carrying out the MDSP's hiring process and retaining data related to its selection of entry-level Troopers.  The United States also received and reviewed extensive data and information from the MDSP in connection with the investigation, including materials purporting to support the Challenged Tests.  After completing its review of the information collected during the pre-suit investigation, the United States presented its findings to the MDSP.  This extensive investigation and the ensuing negotiations armed the Parties with the information necessary to evaluate the strength of the United States' case and the type and amount of relief it could recover at trial.

The Decree was certainly not the product of collusion.  Rather, agreement was reached after extensive arms-length settlement negotiations.  "The Court may presume that no fraud or collusion occurred between counsel, in the absence of any evidence to the contrary."  *Klein*, 705 F. Supp. 2d at 651 (citation and internal quotation marks omitted).  No such evidence exists here, nor does the Decree contain any terms, such as the provision of significant attorney's fees for one side's counsel, which might incentivize fraud or collusion.  Rather, the Consent Decree here

is the result of extensive arms-length negotiations by experienced counsel zealously representing the interests of their respective clients after reviewing the strengths and weaknesses of their case.

Moreover, the experience of counsel who negotiated the settlement further supports that the Decree is fair. *See North Carolina*, 180 F.3d at 581 (quoting *Carson*, 606 F.2d at 430). Counsel handling negotiations for the United States are experienced and well-versed in the issues of this specific litigation as well as Title VII enforcement cases generally. *See id.* (quoting *Carson*, 606 F.2d at 430). The Consent Decree is the product of an investigation conducted by a federal agency with responsibility to the public interest and expertise in Title VII, expertise and responsibility to which the Court may afford "substantial weight." *See Am. Canoe Ass'n*, 54 F. Supp. 2d at 625 (citing *Bragg*, 54 F. Supp. 2d at 660); *see also Baltimore Cty.*, 2021 WL 2000480, at *9. And the terms of the Decree were reviewed and approved by the Maryland Attorney General's Office, the Assistant Attorney General for the Civil Rights Division of the United States Department of Justice, as well as the United States Attorney for the District of Maryland. *See United States v. Westvaco Corp.*, No. MJG-00-2602, 2016 WL 4492704, at *5 (D. Md. Aug. 26, 2016).

### 4.    The Decree Provides for Two Hearings to Ensure Fairness.

To safeguard against later challenges and ensure the Court can fully hear any third-party objections, the Consent Decree provides for both a Fairness Hearing on the Consent Decree prior to its final approval by the Court and a Fairness Hearing on Individual Relief prior to the implementation of that relief. Ex. A ¶¶ 12, 78. Both fairness hearings comport with the provisions of Title VII that protect a Title VII settlement agreement or consent decree from collateral attack, while addressing due process concerns. Section 703(n)(1) of Title VII provides:

21

(A)    Notwithstanding any other provision of law . . . an employment practice that implements and is within the scope of a litigated or consent judgment or order that resolves a claim of employment discrimination under . . . Federal civil rights laws may not be challenged . . .

(B)    . . . in a claim under the Constitution or Federal civil rights laws –

    (i)    by a person who, prior to the entry of the judgment or order . . . had –

        (I)    actual notice of the proposed judgment or order sufficient to apprise such person that such judgment or order might adversely affect the interests and legal rights of such person and that an opportunity was available to present objections to such judgment or order by a future date certain; and

        (II)    a reasonable opportunity to present objections to such judgment or order. . . . .

42 U.S.C. § 2000e-2(n)(1).

Persons whose interests may be affected by the Consent Decree will be provided with notice of both the Decree and the Fairness Hearing on the Decree and will have the opportunity to object to the Decree. Ex. A ¶¶ 22, 79. The Fairness Hearing on the Consent Decree gives this Court the opportunity to consider those objections. *Id.* ¶ 34. Prior to the Fairness Hearing on Individual Relief, again, claimants will receive notice of the hearing, as well as notice of what individual remedial relief, if any, they may be awarded, and instructions for filing objections to the proposed awards of individual remedial relief. *Id.* ¶¶ 79-81. The Fairness Hearing on Individual Relief then gives this Court the chance to consider any objections and ensure that the awards of individual remedial relief are fair and equitable. *Id.* ¶¶ 84, 88. The notice provisions of the Consent Decree, in conjunction with the other procedures set forth in the Decree, are sufficient to meet the requirements of Section 703(n)(1) of Title VII and to ensure more generally that the Decree is fair.

## VI.     CONCLUSION

For the foregoing reasons, the Parties respectfully request that the Court enter the accompanying proposed Order, which provisionally approves and enters the Consent Decree; schedules an initial fairness hearing for a date no earlier than 120 days after the Decree is provisionally approved an entered; and stays all deadlines pending the Court's determination, at or after the Fairness Hearing on the Terms of the Consent Decree, of whether to enter the Decree as a final order.

Date: October 2, 2024

Respectfully submitted by,

**FOR PLAINTIFF UNITED STATES OF AMERICA:**

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

EREK L. BARRON
United States Attorney
District of Maryland

KAREN D. WOODARD
Chief
Employment Litigation Section

SARAH A. MARQUARDT
Co-Chief, Civil Rights & Special Victims Section
District of Maryland

HECTOR F. RUIZ, JR.
Deputy Chief
Employment Litigation Section

*/s/ Emily Given*
EMILY GIVEN
NY Bar No. 5420211
CHEYENNE N. CHAMBERS
NC Bar No. 48699
Senior Trial Attorneys
Civil Rights Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 532-5696
(202) 532-3850
Emily.Given@usdoj.gov
Cheyenne.Chambers@usdoj.gov

*/s/ Kimberly S. Phillips*
KIMBERLY S. PHILLIPS
MD Bar No. 811611
Assistant United States Attorney
District of Maryland
6500 Cherrywood Lane, Suite 200
Greenbelt, MD 20770
(410) 209-4800
Kimberly.Phillips@usdoj.gov

**FOR DEFENDANT MARYLAND DEPARTMENT OF STATE POLICE:**

ANTHONY G. BROWN
Attorney General

*/s/ Phillip M. Pickus*
PHILLIP M. PICKUS
(Bar No. 22814)
AMY E. HOTT
(Bar No. 27823)
Assistant Attorneys General
Maryland Department of State Police
1201 Reisterstown Road

Pikesville, Maryland 21208
410-653-4437 (tel)
410-653-4270 (fax)
Philip.pickus@maryland.gov
Amy.hott@maryland.gov